Joseph E. DURAN, Appellant,

v.

UNITED STATES of America, Appellee.

No. 15949.

United States Court of Appeals Fifth Circuit.

June 28, 1956.

Joseph A. Calamia, El Paso, Tex., for appellant.

Holvey Williams, Asst. U. S. Atty., El Paso, Tex., Russell B. Wine, U. S. Atty., San Antonio, Tex., for appellee.

Before HUTCHESON, Chief Judge, and RIVES and BROWN, Circuit Judges.

RIVES, Circuit Judge.

The appellant and two co-defendants were found guilty by a jury of importing 64 ounces of bulk marihuana into the United States in violation of 26 U.S.C.A. § 4755(a), and of concealing said marihuana in violation of 18 U.S.C.A. § 545. The appellant was sentenced to imprisonment for a term of three years. He alone appeals and specifies but one error, viz.: "The trial court erred in overruling appellant's motion for a judgment of acquittal."

The two co-defendants, Alonzo Carlos Duran and Ray Rubel Medina, traveling in Carlos' automobile, were stopped for a routine inspection at the International Bridge in El Paso, Texas, as they were returning from Juarez, Mexico. They declared one bottle of liquor. A search of the car revealed seventeen packages of marihuana in cellophane under the back seat and four such packages in a paper bag along the right side of the motor. There was also found in the car a small pair of scales. Carlos claimed the marihuana and tried to exonerate Medina. Both denied that any other person was involved.

Carlos had in his possession a key to a public check locker located at the Greyhound Bus Station in El Paso, and stated that he had left two suitcases in that locker. One of the officers investigated and found the locker empty. He learned from the locker attendant that, at approximately 8:05 P.M., some five or ten minutes after the car had been stopped, "Joe E. Duran" had made an affidavit that he had lost his locker key, and thereafter, the attendant had opened the locker with a master key, and had allowed him to remove two suit cases. Shortly thereafter, the appellant was arrested at the American Bus Station some two blocks from the Greyhound Station.

The arresting officer testified:

"I noticed Joe Duran talking to one of the ticket sellers. I identified myself and asked him what his name was. He stated that his name was Duran. I asked him if it was Joe Duran and he said 'yes'. From there O'Brien and myself questioned him relative to the two suitcases that had disappeared from Locker 136 at the Greyhound Bus Depot. He readily admitted his identity, that he had filed or executed a lost key claim at the Greyhound Bus Depot, and that he had the two suitcases in a locker there at the American Bus Depot. Then he unlocked the locker and produced the suitcases. * * * We asked him, the defendant Joe Duran, about how he came to be in El Paso. He stated that he came to El Paso with his nephew, Alonzo Carlos Duran, and a boy by the name of Medina, in Carlos' Chevrolet. He related approximately the same story about their leaving Antonito, and that he himself had paid the expenses of the car to El Paso; that upon arriving in El Paso they had put the suitcases in Locker No. 136; that he himself had gone to Juarez alone; that the other two boys had gone over in the Chevrolet and that they had gotten together in a cafe in Juarez but he didn't remember the name of the cafe; that they had slept in the Chevrolet together, the three of them, in Juarez on the street for possibly five or six hours after midnight until daylight, and that along in the afternoon on December 19th that he and Carlos, his nephew, had had an argument over money matters, that Carlos had wanted to borrow some money from him and that he refused to let Carlos have the money, and that he left them about six o'clock and came back to El Paso alone; and that he had loafed around El Paso until shortly after eight o'clock in the evening when he had gone to the Greyhound Bus Depot and filed this lost key claim with Mr. Nisbet; that he had decided to return to Colorado by way

of the American Bus Lines and that he had inquired about buses, and that he could get a bus to Fort Garland, Colorado, and that was what he had intended to do. I asked him how much money he had when he left Antonito. He stated that, well, he wasn't sure, about sixty dollars. He stated that he had a little over fifty-six dollars left; that he had paid the expenses down to El Paso and Juarez and that he had expected to pay the expenses back to Antonito.

"Q. Did you ascertain from any of them who owned these two suitcases? A. Both Joe and Carlos stated that the larger suitcase belonged to Joe. The smaller of the cases belonged to Carlos."

None of the defendants took the stand.

The theory of the Government is well expressed in its brief:

"One would have to ignore realities to reach any conclusion other than that Joe for some unexplained reason was more reluctant to be caught in possession of the marihuana than were the other two boys and had, therefore, preceded them across the Bridge. It likewise seems equally as clear that he waited in sight of the Bridge on the American side and as soon as his buddies were arrested rushed to the Bus Station, obtained the suitcases, and was attempting to leave town. Appellant was the only one with any money and readily admitted that he had paid the expenses of the trip to El Paso and was going to pay the expenses home."

That is a good theory and it may be true, but it has not been proved. It rests purely on speculation. There was no proof of the distance of the Greyhound Bus Station from the bridge, nor even that it would have been possible for the appellant to reach that station when he did, if it is further assumed that he had theretofore witnessed the arrest of his two co-defendants. True, appellant took both his own and his nephew's suitcase. That looks suspicious, but both suitcases were in the same locker and he would not have been permitted to take one and leave the other. His conduct when confronted by the officers was free from any suspicion of deception. All that has been proved is his association with his nephew and with Medina, possibly a guilty association but one entirely consistent with appellant's innocence. The proof does not measure up to that high standard required by a proper and scrupulous respect for human liberty. See Rent v. United States, 5 Cir., 209 F.2d 893; Vick v. United States, 5 Cir., 216 F.2d 228; Kassin v. United States, 5 Cir., 87 F.2d 183; Compare Holland v. United States, 348 U.S. 121, 139, 75 S.Ct. 127, 99 L.Ed. 150; Morales v. United States, 5 Cir., 228 F.2d 762.

The judgment is, therefore, reversed and judgment here rendered discharging the appellant.

Reversed and rendered.