NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0525n.06

No. 12-5610

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
*May 28, 2013*
DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA,

    Plaintiff- Appellee,

v.

EXSAUL SILVA-GARCIA,

    Defendant- Appellant.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF KENTUCKY

_____/

BEFORE:    CLAY and COOK, Circuit Judges; OLIVER, District Judge.[*]

    **CLAY, Circuit Judge.**  Defendant Exsaul Silva-Garcia appeals his conviction and sentence for aiding and abetting co-defendants in possessing over 1,000 kilograms of marijuana with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. He argues that his due process rights under the Fifth Amendment were violated when the government presented his co-defendant as a key government witness. For the following reasons, this Court finds that there was no due process violation and, thus, we **AFFIRM** Defendant's conviction and sentence.

_____

[*]The Honorable Solomon Oliver, Jr., Chief Judge, United States District Court for the Northern District of Ohio, sitting by designation.

BACKGROUND

## A.   Procedural History

In February 2010, Defendant, along with several co-defendants, was charged with conspiring to possess more than 1,000 kilograms of marijuana with the intent to distribute, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846; and with aiding and abetting co-defendants in possessing more than 1,000 kilograms of marijuana with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Defendant absconded from federal bond supervision prior to the trial and, thus, the trial of his co-defendants proceeded without him in early June 2011.[1] After the district court issued a bench warrant for Defendant's bond violation, he was detained later that month.

Defendant was tried individually in February 2012. The government's case during that trial, as noted by the district court, was circumstantial, and its key witness linking Defendant to the conspiracy was co-defendant Eladio Hernandez-Lopez, Jr. At the close of the government's case-in-chief, Defendant moved the district court for a judgment of acquittal under Federal Rule of Criminal Procedure 29. The motion was denied. Defendant then moved, after a recess, to strike Lopez's testimony, moved for a mistrial based on prosecutorial misconduct arguing that the government violated Defendant's due process rights by putting on Lopez's perjured testimony, and renewed his motion for judgment of acquittal. The district court denied the motions, finding that Defendant had not established his claim of perjury because Lopez's testimony was consistent with his earlier

---

[1]Defendant was indicted with seven co-defendants, two were found guilty after the June 2011 trial (Eladio Hernandez-Lopez Jr. and Rodrigo Macias-Farias); four pleaded guilty (Carlos Mora-Sanchez, Cupertino Gonzalez-Alverado, Fernando Cortez-Briones, and Jorge Mejia-Rentaria), and one absconded (Rafael Lara-Gascon).

testimony and because the government did not try to hide the fact that Lopez was convicted despite his claims of innocence. The district court also noted that the Defendant had ample information with which to demonstrate any inconsistencies in Lopez's position.

The jury found Defendant guilty of only the aiding-and-abetting count. He was sentenced to the statutory minimum of 120 months' imprisonment. Defendant timely appealed his conviction and sentence to this Court.

## B.     Factual Background

This case arises from events on February 25, 2010, in which, during an on-going undercover investigation,[2] Drug Enforcement Administration ("DEA") agents seized a shipment of over 3,700 pounds of marijuana in Louisville, Kentucky, that originated in McAllen, Texas. DEA agents observed Defendant that morning as he was picked up from a hotel room by two already-known members of the drug conspiracy,[3] and tracked the vehicle transporting the threesome as it met up with and led a tractor trailer, driven by co-defendant Eladio Lopez, to a farm in a rural area. Lopez's truck, unable to make the turn onto the farm's property, became lodged on an embankment. Lopez left the truck on foot, while Defendant fled with his two companions to a nearby gas station. DEA agents quickly discovered the marijuana in the unattended truck, detained Lopez walking down the

---

[2]DEA agents tracked a 1700-pound shipment of marijuana from Mission, Texas, to Memphis, Tennessee, several weeks earlier. They observed Sean Lacefield, and co-defendants Rodrigo Macias-Farias and Rafael Lara-Gascon, picking up the delivery. Lacefield, who was later questioned about his involvement, agreed to cooperate and provided the tip on the shipment from McAllen.

[3]Defendant was in the car with Macias-Farias and Lara-Gascon, two individuals that were involved with the 1700-pound shipment to Memphis.

3

street, and then detained Defendant and his companions at the gas station.  At the time of his arrest, Defendant had two cell phones on his person, one of which had been in contact with Lopez's cell phone fifty-seven times between the day before, February 24, 2010, and that morning of the arrest.

*Lopez's Trial and Sentencing*

At Lopez's separate June 2011 trial, he proclaimed his innocence and attempted to explain away much of his suspicious activity.  Lopez testified that he did not know that marijuana was in the truck.  He claimed that he made the stop in Louisville, which was off his trucking route, because he received several calls from someone named "Savul," who identified himself as the truck owner and who directed him to the rural farm in the Louisville area.  Lopez, when correcting the government's assertion that the caller identified himself as "Exsaul" on the phone, stated that "He said 'SAVUL,' not 'Exsaul.'" (R. 322, Lopez's Trial Tr., at p. 57.)  The several calls traced back to the phone that was found on Defendant's person when he was arrested.

Despite his claims of innocence, Lopez was convicted on both counts of the superseding indictment, and at his sentencing hearing the government sought an obstruction-of-justice enhancement for, *inter alia*, the following statements that the government believed to be false: (a) that Lopez made a 24-hour stop due to mechanical problems rather than to fill his load with marijuana, (b) that he abandoned the truck in Louisville to look for road signs rather than to flee the scene, and (c) that he did not know he was transporting marijuana.  The district court did not find that Lopez's statements were false, though it certainly doubted their truthfulness, and noted that the jury could have believed Lopez's testimony and still convicted him for his willful ignorance.  The district court found that the obstruction-of-justice enhancement did not apply.

4

*Defendant's Trial and Sentencing*

Despite the earlier argument that portions of Lopez's testimony were false, the government presented Lopez as a witness in Defendant's trial. The amended trial transcript shows that Lopez's testimony was consistent with his testimony from his earlier trial. When discussing the phone calls received from the cell phone found on Defendant's person, Lopez again testified that the caller identified himself as "Savul," a purported part-owner of the truck, and it was "Savul" who directed Lopez to drive his truck to Louisville. Defendant attempted to undermine Lopez's credibility on cross-examination, calling into question Lopez's claim of innocence, including the same statements the government challenged as false during Lopez's sentencing hearing. On cross-examination, Defendant also noted that Lopez never identified "Exsaul" as the caller; rather, as Lopez reiterated, he said "Savul" called him. The government argued at Defendant's trial that "Savul" was the short form of Exsaul.[4]

This appeal followed Defendant's conviction and sentence, challenging the district court's finding that there was no due process violation by the government's use of Lopez as a witness.

**DISCUSSION**

A.     **Applicable Law and Standard Review**

"A conviction obtained by the knowing use of perjured testimony must be set aside if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .'"

---

[4]From the record, it appears that both the government's and defense counsel's attempts to repeat after Lopez's pronunciation of the name are documented as "Sawul." (*See* R. 390, PID# 2779, 2785, 2786.) It appears that "Savul" is the same as "Sawul," except with a different accent. Although one cannot be sure without the audio, the record does support at least that Lopez accepted "Sawul" as the same name as "Savul," whereas he adamantly denies saying "Exsaul."

5

*Rosencrantz v. Lafler*, 568 F.3d 577, 583 (6th Cir. 2009) (quoting *Gilgio v. United States*, 405 U.S. 150, 154 (1972)). The same is true "'when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.'" *Brooks v. Tennessee*, 626 F.3d 878, 894 (6th Cir. 2010) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). Such a claim arises under the rule of *Brady v. Maryland*, 373 U.S. 83 (1963), that the prosecution must disclose evidence favorable to the accused. *Rosencrantz*, 568 F.3d at 583; *see also United States v. Agurs*, 427 U.S. 97, 103 (1976)*.*

To establish a *Brady/Giglio* claim, there must be a showing that: "(1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." *Rosencrantz*, 568 F.3d at 583–84. Under the first factor, the false-testimony assessment, we must find the allegedly false statements to be "'indisputably false,' rather than merely misleading." *Byrd v. Collins*, 209 F.3d 486, 517 (6th Cir. 2000) (citation omitted). "[M]ere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony." *United States v. Scarborough*, 43 F.3d 1021, 1026 (6th Cir. 1994) (citation and internal quotation marks omitted). With respect to the second factor, the materiality assessment, we consider whether there is a "reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103 (citing *Giglio*, 405 U.S. at 154). Notwithstanding, this Court will not reverse the conviction if, under *Brecht v. Abrahamson*, 507 U.S. 619 (1993), the error is harmless. *Rosencrantz*, 568 F.3d at 584. That is, we will not reverse unless the statements had a "substantial and injurious effect or influence" on the jury's verdict. *Brecht*, 507 U.S. at 623.

This Court recently acknowledged that there is some confusion concerning the applicable standard of review, whether *de novo* or abuse of discretion, when reviewing due process challenges

6

under *Brady*. *See United States v. Douglas*, 634 F.3d 852, 860 (6th Cir. 2011). We need not resolve this issue here because, even under the less-deferential *de novo* standard, we find no error in the district court's determination.

## B.      Analysis

Defendant's claim must fail because there is no proof that any of Lopez's statements were false or that the government withheld *Brady* information to preclude Defendant from impeaching any inconsistencies in Lopez's testimony on cross-examination. Defendant argues that the government violated his right to due process: (1) by virtue of seeking an obstruction-of-justice enhancement at Lopez's sentencing hearing and then using him as a government witness; and (2) by permitting Lopez to falsely testify that the caller who directed him to the rural farm in the Louisville area identified himself as "Exsaul." Both claims lack merit.

First, there were three specific statements that were called into question at Lopez's sentencing hearing, none of which were found to be false by the sentencing court in Lopez's case or established as false, much less "indisputably false," by Defendant at his own trial. *See Byrd*, 209 F.3d at 517. Defendant also cannot show that the government's *speculation* somehow amounted to an objective *knowledge* that these statements were false. Moreover, these statements, unrelated to how Lopez implicated Defendant, were not reasonably likely to have affected the judgment of the jury in Defendant's trial, *see Agurs*, 427 U.S. at 103; nor could such an allegation survive a harmless error analysis.

Second, there was nothing inconsistent about Lopez's testimony with respect to the identity of the caller. The amended trial transcript in this case shows that Lopez's testimony was consistent

7

with his testimony at his own trial; he consistently asserted that he spoke with someone named "Savul" who identified himself as the owner of the truck Lopez was driving and who directed Lopez to make the Louisville stop. Moreover, as the district court noted, the government by no means attempted to withhold any information relating to Lopez's earlier trial and conviction to support Defendant's *Brady/Gilgio* claim. *See id.*; *Brooks*, 626 F.3d at 896. Indeed, Defendant was equally positioned to, as he did, call into question the credibility of Lopez's testimony on cross-examination. To the extent that Defendant believed he heard Lopez testify inconsistently, Defendant could have easily attempted to cross-examine and impeach Lopez before the trial court.

## CONCLUSION

In sum, the record does not support Defendant's *Brady/Giglio* claim because there is no evidence that Lopez's statements were false or that any *Brady* information was withheld to preclude Defendant from impeaching perceived inconsistencies in Lopez's testimony on cross-examination. For this reason, we **AFFIRM** Defendant's conviction and sentence.